JOSH A. KREVITT (SBN 208552)
jkrevitt@gibsondunn.com
STUART ROSENBERG (SBN 239926)
SRosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel: (650) 849-5300
Fax: (650) 849-5333

WAYNE BARSKY (SBN 116731)
wbarsky@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
Tel: (310) 557-8183
Fax: (310) 552-7010

Y. ERNEST HSIN (SBN 201668)
EHsin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Tel: (415) 393-8224
Fax: (415) 374-8436

Attorneys for Plaintiff Fitbit, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC.,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>KONINKLIJKE PHILIPS N.V., and PHILIPS NORTH AMERICA LLC,<br><br>　　　　　　Defendant. | **COMPLAINT FOR PATENT INFRINGEMENT**<br><br><br>**[DEMAND FOR JURY TRIAL]** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Fitbit, Inc. ("Fitbit") for its complaint against Defendants Koninklijke Philips N.V. ("Philips-NV") and Philips North America LLC ("Philips-NA") (collectively, "Philips" or "Defendants"), hereby demands a jury trial and alleges as follows:

### THE PARTIES

1.      Fitbit is a Delaware corporation with its principal place of business located at 405 Howard Street, San Francisco, CA 94015.

2.      On information and belief, Philips-NV is a Dutch company with its principal place of business at High Tech Campus 34, 5656 AE Eindhoven, the Netherlands.

3.      On information and belief, Philips-NA is a Delaware corporation with its principal place of business at 3000 Minuteman Road, Andover, Massachusetts 01810.  Philips-NA is a wholly owned subsidiary of Philips-NV.

### JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States of America, Title 35 of the United States Code, and this Court has subject matter jurisdiction over the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Philips in this action pursuant to, inter alia, California Code of Civil Procedure § 410.10 and/or Federal Rule of Civil Procedure 4(k)(2), including because Philips has committed and continues to commit acts of infringement within the State of California and this judicial district giving rise to this action, including by, among other things, importing, offering to sell, and selling products and services that infringe the asserted patents.

6.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(c)(3), 1400(b).  As noted above, Philips has committed and continues to commit acts of infringement within this judicial district giving rise to this action, and Philips-NA has regular and established places of business in this judicial district.  For example, Philips-NA maintains offices and/or employs employees at least at 4430 Rosewood Drive, Suite 200, Pleasanton, California, 94588-3050.

Gibson, Dunn & Crutcher LLP

1

**PATENTS-IN-SUIT**

2

7.      U.S. Patent No. 7,145,462 (the "'462 patent"), entitled "System and Method for

3

Automatically Generating an Alert Message with Supplemental Information," was duly and legally

4

issued by the U.S. Patent and Trademark Office on December 5, 2006.  The '462 patent is assigned to

5

Fitbit.  A copy of the '462 patent is attached as **Exhibit A**.

6

8.      U.S. Patent No. 8,868,377 (the "'377 patent"), entitled "Portable Monitoring Devices

7

and Methods of Operating Same," was duly and legally issued by the U.S. Patent and Trademark Office

8

on October 21, 2014.  The '377 patent is assigned to Fitbit.  A copy of the '377 patent is attached as

9

**Exhibit B**.

10

9.      The '462 patent and '377 patent are collectively referred to herein as the "Patents-in-

11

Suit."  By assignment, Fitbit owns all right, title, and interest in and to the Patents-in-Suit.  Fitbit has

12

the right to sue and recover for the infringement of the Patents-in-Suit.

13

**BACKGROUND**

14

10.     Plaintiff Fitbit is a leading, globally recognized technology company founded and

15

headquartered in San Francisco and responsible for developing and bringing to the market award-

16

winning smartwatches and wearable trackers.  Fitbit's design and innovation integrate communication

17

technology, payment systems, voice recognition, health monitoring, sleep tracking, and more into

18

globally recognized and award-winning consumer products.  Fitbit's innovation captures leading

19

engineering and design to power and deliver health solutions that impact health outcomes for users

20

worldwide.  Fitbit's mission is to empower and inspire users to live healthier, more active lives.  Fitbit

21

designs and sells products that fit seamlessly into users' lives so that consumers can achieve their health

22

and fitness goals.

23

11.     Fitbit's line of wearable smartwatches and trackers includes the Fitbit Charge 3™, Fitbit

24

Inspire™, Fitbit Inspire HR™, and Fitbit Ace 2™ activity trackers, in addition to the

25

Fitbit Ionic™, Fitbit Versa 2™ and Fitbit Versa Lite Edition™ smartwatches.  Fitbit's advanced family

26

of smartwatches and trackers is the result of Fitbit's investment of hundreds of millions of dollars per

27

year in research and development (including in this judicial district), resulting in numerous

28

technological advances and hundreds of patents worldwide.  Based on Fitbit's research and design, its

Gibson, Dunn &
Crutcher LLP

2

1    smartwatches and trackers are widely recognized as among the best and most advanced products of

2    their type.  *See, e.g.*, https://www.fitbit.com/us/buzz.

3         12.    Fitbit smartwatches and trackers enable users to view data about their daily activity,

4    exercise, and sleep.  Fitbit's software and services, which include an online dashboard and mobile app,

5    provide users with data analytics, motivational and social tools, and virtual coaching through

6    customized fitness plans and interactive workouts.  These devices track users' daily steps, calories

7    burned, distance traveled, and active minutes, and display real-time feedback to encourage users to

8    become more active in their daily lives.  Together, Fitbit's devices, services, and software have helped

9    millions of users on their health and fitness journeys be more active, sleep better, eat smarter, and

10   manage their weight.

11        13.    Fitbit's smartwatches and trackers thus enable a wide range of people to get fit their

12   own way, whatever their interests and goals.  Fitbit's users range from people interested in improving

13   their health and fitness through everyday activities, to endurance athletes seeking to maximize their

14   performance.  To address this wide range of needs, through its research and development, Fitbit designs

15   its devices to create powerful yet easy to use products that fit seamlessly into peoples' daily lives and

16   activities.  As a result of Fitbit's efforts and research, its smartwatches and trackers have aided millions

17   of people in meeting their fitness and health goals, including in California and this judicial district.

18        14.    Philips has apparently expended significant resources to analyze Fitbit's products,

19   technology, and development of that technology.  Philips has recently initiated litigation against Fitbit

20   in multiple jurisdictions.   For example, Philips initiated an investigation at the United States

21   International Trade Commission, alleging, *inter alia*, that certain of Fitbit's products infringe a patent

22   owned by Philips *and* that that patent is also practiced by one of Philips's own products—the Philips

23   Lifeline systems with HomeSafe or GoSafe alert devices—that, as demonstrated in this Complaint,

24   infringes Fitbit's patent.  *See* https://www.usitc.gov/press_room/news_release/2020/er0110ll1213.htm

25   (noting institution of ITC Investigation No. 337-TA-1190).  In another litigation filed by Philips against

26   Fitbit, Philips has asserted that the Philips Lifeline systems with HomeSafe or GoSafe alert devices are

27   the result of Philips's own "innovation in the area of connected health."  *See, e.g.*, *Philips No. Am. LLC*

28   *v. Fitbit, Inc*., 19-cv-11586-IT, Dkt. 25, ¶¶ 4, 24–26, (Am. Compl.) (D. Mass. Nov. 27, 2019).  As

demonstrated below, this is not true—Philips instead appears to be attempting to build its products and services on the back of Fitbit's technology and intellectual property.

15.     Philips's recent actions against Fitbit demonstrate Philips's focus and attention on Fitbit's products and technology.  On information and belief, Philips has either internally reviewed not only Fitbit's products but also its patents, or instead chosen to analyze Fitbit's products and technology, but affirmatively ignore or turn a willful blind eye to Fitbit's patents.

16.     Fitbit brings this suit to end Philips's free-riding on Fitbit's patented technology.

**COUNT I**

**Infringement of United States Patent No. 7,145,462**

17.     Fitbit realleges the foregoing paragraphs as though fully set forth here.

18.     The '462 patent claims a system and method for an automated monitoring and response system that is capable of automatically generating not only an alert message, but also capable of providing supplemental information to the responder.  The '462 patent provides an alert message relating to a user in an environment by having at least one sensor and storing information about the user and environment, identifying an emergency situation using the sensor(s), generating a primary alert message component with information about the location of the emergency, type of emergency, and user identification, automatically generating a supplemental alert message component relating to the actor and/or environment, and electronically sending the primary and supplemental alert message components to at least one responder.

19.     The '462 patent recites multiple technical implementation details that address the deficiencies in conventional prior art emergency alert systems and methods, namely the lack of more contextualized, customizable, and/or specified alert details to be conveyed to responders.  *See, e.g.*, '462 patent at 2:38–41.  These implementation details and combination of steps in the '462 patent claims would be recognized by persons of skill in the art as unconventional.

20.     While prior art systems could provide limited information relating to a situation, such as a notification that an emergency situation possibly exists (*id.* at col. 1:48–56), the claimed inventions of the '462 patent provide both a "primary alert message component" that includes "an indication that the at least one emergency situation exists, a location of the at least one emergency situation, an

emergency type classification, and actor identification information" and a "supplemental alert message component" including contextual information about the actor and/or the environment based on information obtained from the sensors.  *See*, *e.g.*, *id*. at 12:1–29; 13:34–59 (claims 1 and 20).

21.     As detailed in the '462 patent, providing the information in both a "primary alert message component" and a "supplemental alert message component" provided unconventional flexibility in the computer architectures of alert systems beyond what had been done.  For example, whereas certain critical information could always be provided in the primary alert message component (*id*. at 12:13–22; 13:45–54), the supplemental alert message component could be more flexible.  Thus, for example, the supplemental information could be stored in separate databases, as opposed to on a device containing the sensor(s), so that large amounts of contextual information could be stored, including in advance of any emergency situation.  '462 patent, col. 5:8–36; 7:8–12.  Whereas the information in the primary alert message component could always be provided, regardless of identity of responder, different supplemental information could be stored for different potential responders, e.g., medical personnel vs. neighbors or family members.  *Id*., col. 12:13–22; 13:45–54; 9:55–10:8.  If one responder was unable to act on the notification, a different responder could be notified and provided supplemental information most appropriate for that particular responder.  *Id*., col. 11:6–40.  Certain supplemental information that is stored for a user could be marked "private," allowing independent decisions on what stored information to provide in the supplemental alert message component for particular responders.  *Id*., col. 8:24–31.  These and other examples of the flexibility of the unconventional architecture of the '462 patent are reflected and embodied in one or more of the claims of the patent.  *Id*., col. 12:1–16:26.

22.     Philips makes, uses, offers for sale, sells, and/or imports certain products in the United States, such as the Philips Lifeline system and subscription service (which includes, for example, the GoSafe and GoSafe 2 devices) that directly and indirectly infringe, literally and/or under the doctrine of equivalents, at least claims 1–7, 10–11, 13, 16–17, 19, 20–23, 27, 34, and 35 of the '462 patent.

23.     Philips Lifeline satisfies all of the claim limitations of at least claims 1–7, 10–11, 13, 16–17, 19, 20–23, 27, 34, and 35 of the '462 patent.  For example, claims 1 and 20 of the '462 patent claim:

Claim 1. A method of providing an alert message relating to an actor in an environment with an automated monitoring and response system, the method comprising:

(a) providing at least one sensor;

(b) storing facts about at least one of the actor and the environment;

(c) identifying an existence of at least one emergency situation relating to the actor or the environment, wherein identifying includes evaluating sensory data provided by the at least one sensor located in the environment in conjunction with the stored facts;

(d) generating a primary alert message component of primary information for enabling a response to the at least one emergency situation, wherein the primary alert message component includes:
    an indication that the at least one emergency situation exists,
    a location of the at least one emergency situation,
    an emergency type classification, and
    actor identification information;

(e) automatically generating a supplemental alert message component comprising non-primary supplemental information relating to the actor and/or the environment and giving context to the at least one emergency situation; and

(f) electronically sending the primary and supplemental alert message components to at least one designated responder.

Claim 20.       An automated monitoring and response system, comprising:

sensors for monitoring an actor and the actor's environment; and

an alert module interfaced with the sensors and adapted to identify an existence of at least one emergency situation relating to the actor or the environment and to generate an alert message for at least one responder;

wherein the alert message includes a primary alert message component and a supplemental alert message component;

wherein the primary alert message component comprises primary information for enabling a response to the at least one emergency situation, the primary information including:
    an indication that the at least one emergency situation exists,
    a location of the at least one emergency situation,
    a basic emergency type classification for the at least one emergency situation, and
    actor identification information;

wherein the supplemental alert message component comprises non-primary supplemental information relating to the actor and /or the environment and giving

COMPLAINT FOR PATENT INFRINGEMENT

context to the at least one emergency situation; and includes data from at least two of the sensors.

24.     Philips advertises that its Philips Lifeline system and service, using, for example, the GoSafe, and GoSafe 2 devices, features multiple sensors that monitor the user (e.g., using accelerometers) and the user's environment (e.g., using barometric sensors).

Unlike other companies' fall detection, ours uses three technologies to detect true falls:

| Accelerometers | Barometric sensors | A finely tuned algorithm |
|---|---|---|
| These sensors will measure a high acceleration force when a fall occurs. | These highly sensitive sensors can detect a very small change in barometric pressure such as one from a standing position to laying on the floor. | Our finely tuned algorithm differentiates between true falls and false alarms. It is the most important part of our AutoAlert technology. |

Combined, these three technologies detect 95 percent of many types of falls and trigger fewer false alarms*.

https://www.lifeline.philips.com/medical-alert-systems/fall-detection.html

25.     Philips advertises that the system stores facts about the user and environment, and is capable of identifying an emergency situation relating to the user or environment, including by identifying and evaluating data from the sensors in conjunction with stored facts.  Philips's sensors are interfaced with an alert module or component of the system that identifies the existence of the emergency situation related to the user or the environment, which then generates an alert message for responders.



**GoSafe 2**

★★★★½  4.5 (4)  Write a review

GoSafe 2 is the newest addition to the Philips Lifeline mobile alert service family. This single piece system includes multiple, advanced locating technologies, fall detection capabilities and two-way voice communication all in a light, comfortable, easy-to-wear pendant. GoSafe 2 provides fast access to help whenever and wherever you need it[5] ...less »

**Product Price:**

https://www.lifeline.philips.com/medical-alert-systems/gosafe-2.html

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR PATENT INFRINGEMENT

1
2
3
4

### What happens when AutoAlert detects a fall

When a fall is detected, AutoAlert connects quickly to our Response Center, even if you're unconscious or unable to move1. The two-way voice communication capability enables you to speak directly with one of our highly trained Philips Lifeline Response Associates. They talk with you, assess the situation, and dispatch the help you need. If the Response Associate is unable to make verbal contact with you, they may default to calling emergency services.

5    https://www.lifeline.philips.com/medical-alert-systems/fall-detection.html

6
7
8



### Fall Detection

9
10
11
12
13

Everyone asks, "but what happens if I can't, or don't remember to push the button"? That is where AutoAlert comes in. Using three different sensors, if AutoAlert detects a fall it will automatically send a signal to our Response Center, enabling us to get you the help you need.

14   https://www.lifeline.philips.com/medical-alert-systems/compare-gosafe.html

15
16
17
18
19
20
21
22
23
24
25



26   https://www.youtube.com/watch?v=oiRYzEEgCWI at 1:16 of 2:49.

27
28

26.     The Philips Lifeline system, including configured with the GoSafe and GoSafe 2 devices, is capable of automatically generating alert messages in response to an emergency situation that, on information and belief, comprise primary and supplemental alert messages components.



https://www.youtube.com/watch?v=WFRTEyBMivk at 0:34 of 0:47.

27.     The relay of primary and/or supplemental message components commences in part at the Go Safe or Go Safe 2 worn devices, which themselves store and collect data per above.  Upon an emergency event, data is relayed either with the assistance of a home base station or through a cellular connection to servers running Philips' Lifeline service, where additional data is collected and available to be added and conveyed to a responder.  Message data is then automatically relayed to the designated Lifeline response and call center, where it can then be further relayed to additional responders.



https://www.youtube.com/watch?v=p78ji-2MMMs at 3:11 of 4:20.



28.    The primary message components enable a response to the emergency, including an indication that an emergency situation exists, location data for the emergency, the type of emergency (e.g., a suspected fall), and actor (i.e., user) identification information.  Upon information and belief, the non-primary (i.e., supplemental) message components include further information relating to the user and/or the environment, which gives further context to the emergency situation—for example, more detailed information concerning the timing or location of the event, or the movement pattern or history of the patient, etc.  This supplemental component may include data from multiple sensors.  The system then electronically sends these message components and information to at least one designated responder.



https://www.gcmchealth.com/filesimages/brochures/Lifeline-Brochure-Web.pdf;
https://www.lifeline.philips.com/content/dam/PLL/PLL-B2C/PDFs/manuals/Manual-gosafe2.pdf

**Our suite of location technologies made simple**



**A-GPS**

Assisted GPS, or "A-GPS" works using a network of satellites to quickly identify your location. Faster than conventional GPS, A-GPS works faster, which means help gets to you quickly.



**WiFi**

Our mobile pendants can use nearby WIFI access points to help identify your location. Wi-Fi locating excels indoors and in other areas where A-GPS may not work well.



**Intelligent location breadcrumbs**

GoSafe records regular location snapshots or "breadcrumbs" and stores them. After you press your button, Philips Lifeline can use the breadcrumbs to help determine your location and your direction of travel.

https://www.lifeline.philips.com/medical-alert-systems/gps-mobile.html

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR PATENT INFRINGEMENT



https://www.youtube.com/watch?time_continue=6&v=_v-L9BP1eEY at 0:06 of 0:47;



https://www.lifeline.philips.com/medical-alert-systems/gosafe-2.html

29.     Claims 2-7, 10–11, 13, 16-17, and 19 depend from claim 1 above and are similarly infringed by the Lifeline system.  By way of example and without limitation, as shown above, on information and belief, the supplemental information can include data generated by multiple sensors; the assessment of the user's situation and/or the environment can be based on sensory data provided by at least one sensor located in the environment, the current data can be compared against prior data according to predefined criteria defining an emergency situation (e.g., a fall), wherein a similarity between the two is indicative of the existence of an emergency (e.g., a fall) ; the existence of an emergency situation (e.g., a fall) can be inferred from circumstantial information about the environment; and, on information and belief in light of the voice activation and communications

capabilities shown above, the supplemental information can include a user's direction of travel or a segment of recorded audio.

30.     Similarly, claims 21–23, 27, 34, and 35 depend from claim 20 above and are similarly infringed by the Lifeline system.  By way of example and without limitation, as shown above, the alert capabilities of the Lifeline system can be adapted to identify an emergency situation relating to the user (e.g., a fall) and can send the alert message to at least one designated responder; the alert capabilities of the Lifeline system can be adapted to compare sensory data provided by the sensors against an algorithm or data reflecting a reference sequence of sensory events representing a predefined emergency situation (e.g., a reference for what changes in barometric pressure could constitute a fall) and to then identify the existence of an emergency situation (e.g., a fall) when the current and reference data coincide; the situation assessment capabilities of the Lifeline system are interfaced with alert capabilities and adapted to assess the current situation of the user and/or environment based on data provided by the sensors (e.g., the barometer and accelerometers), wherein the alert capabilities are adapted to compare the current situation (e.g., rapid changes in barometric pressure, coupled with rapid acceleration and deceleration measured by accelerometers) against at least one reference situation representing a predefined emergency situation (e.g., the data profile of rapid changes in pressure and acceleration and deceleration indicative of a fall), wherein the alert capabilities are adapted to identify the existence of an emergency (e.g. a fall) when there is similarity between the current situation assessment and a reference situation (e.g., similarity between the current sensor data and the reference data expectations indicative of a fall).

31.     Subject to discovery and review of the source code for Philips's Lifeline system, Fitbit anticipates that additional claims of the '462 patent may be infringed by Philips as well.

32.     Each of the above steps of the claimed methods is performed in the United States, and each element of the claimed systems exists in the United States.  By making, using, offering for sale, selling, and/or importing into the United States the Philips Lifeline System, including the GoSafe, and GoSafe 2 devices, without license or permission from Fitbit, Philips has in the United States infringed, and unless enjoined, will continue to infringe, the '462 patent in violation of to 35 U.S.C. § 271(a).

33.     In violation of 35 U.S.C. § 271(b), Philips has also actively induced, and will continue to actively induce, users of its infringing system, service, and products to infringe the '462 patent. Philips offered and continues to offer its infringing service and products for sale, and instructed and continues to instruct users to operate them in an infringing manner through, without limitation, advertisements, product documentation or instructions, and customer support.  Philips had actual knowledge of the '462 patent since at least on or around January 13, 2017, when the '462 patent's published application was cited to Philips by the PTO as a basis for rejecting Philips's own patent claims in its U.S. Patent Application 15/106,065, claims Philips was trying to obtain in the same field as the '462 patent.  Moreover, on information and belief, through at least a program of willful blindness, Philips also had constructive knowledge of the patent.  Philips knows and has known or seeks to remain willfully blind that its actious would induce and continue to induce users of its infringing system and products to infringe the '462 patent.  On information and belief, Philips specifically intended that infringement.  As a result of Philips's inducement, users of its infringing system and products have infringed and continue to infringe the '462 patent.

34.     In violation of 35 U.S.C. § 271(c), Philips has also contributed to and continues to contribute to the infringement of the '462 patent by the users of its infringing system and products.  By way of example, Philips has imported, sold, offered for sale, and continued to sell, offer for sale, and import products like the GoSafe and GoSafe 2 for use in its Lifeline service, which products constitute material parts of the '464 invention.  Philips knew that these products were especially made for use in the infringing Lifeline system, and hence made especially for infringing the '464 patent, given that they are not a staple article or commodity of commerce and have no substantial non-infringing use.

35.     Philips's infringement of the '462 patent is willful.  As stated above, Philips had actual knowledge of the '462 patent since at least January 2017 or maintained a program of willful blindness, and thus had constructive knowledge of the '462 patent.  Yet, Philips disregarded the patent and continued to disregard an objectively high likelihood that its actions infringe.  This risk is or was known to Philips, or so is obvious that Philips should know of it or have known of it.

36.     As a result of Philips's infringement of the '462 patent, Fitbit is damaged and irreparably harmed by Philips's infringement and will suffer additional irreparable damage and impairment of the

value of its patent rights unless Philips is enjoined from continuing to infringe the '462 patent.  Fitbit is also entitled to monetary damages in an amount adequate to compensate for Philips's infringement, but in no event less than a reasonable royalty for the use made of the invention by Philips, together with interest and costs as fixed by the Court.

37.     Philips's infringing activities have injured and will continue to injure Fitbit, unless and until this Court enters an injunction prohibiting further infringement of the '462 patent, and, specifically, enjoining further manufacture, use, sale, importation, and/or offers for sale that come within the scope of Fitbit's patent rights.

### COUNT II

### Infringement of United States Patent No. 8,868,377

38.     Fitbit realleges the foregoing paragraphs as though fully set forth here.

39.     The '377 patent is directed to and claims portable monitoring devices and methods of operating the same.  The '377 patent discloses portable activity monitoring devices to calculate activity by having the device coupled to the body of the user, having at least one tri-axial accelerometer to generate sensor data, and calculating and displaying activity points corresponding to the physical activity of the user.

40.     As embodied in the claims and described in the specification, the '377 patent is directed to a wearable fitness monitoring device that employs multiple, specific sensors to more accurately collect a user's cumulative physical activity and calculate "activity points" that correlate to an amount or an amount and intensity of physical activity.  '377 patent at col. 8:46–52; 17:18–30; 17:31–34; 18:39–45; 39:31–42; 43:26-45; 44:5–23.  These implementation details and combination of elements in the claims of the '377 patent would be recognized by persons of skill in the art as unconventional.

41.     By way of example, the claims of the '377 patent cover a device having, *inter alia*, "a housing having a physical size and shape," "a plurality of sensors, disposed in the housing . . . includ[ing] at least three accelerometers," (or a tri-axial accelerometer) "processing circuitry . . . electrically coupled to the plurality of sensors," and "a display, coupled to the processing circuitry." *See* '377 patent, col. 43:27–45.  As explained in the '377 patent, the claimed combination of elements and their physical configuration, in combination with the calculation of activity points correlating to

COMPLAINT FOR PATENT INFRINGEMENT

Gibson, Dunn & Crutcher LLP

an amount or an amount and intensity of activity, resulted in improved and more accurate determinations of activity over the conventional art and what had been previously done, based, *e.g.*, on more accurate determination of a user's state or environment. *Id.*, col. 8:46–52; 17:18–30; 17:31–34; 18:39–45; 39:31–42.

42.     Philips makes, uses, offers for sale, sells, and/or imports certain products, such as the Philips Snoring Relief Band, in the United States that directly infringe, literally and/or under the doctrine of equivalents, at least claims 1, 10, and 25 of the '377 patent.

43.     The Philips Snoring Relief Band satisfies all of the claim limitations of independent claims 1, 10, and 25 of the '377 patent.



44.     Claims 1, 10, and 25 of the '377 patent respectively claim:

1. A portable activity monitoring device to calculate activity points corresponding to a physical activity of a user, the portable activity monitoring device comprising:

a housing having a physical size and shape that is adapted to couple to the body of the user;

a plurality of sensors, disposed in the housing, to generate sensor data which is representative of activity of the user, wherein the plurality of sensors includes at least three accelerometers;

COMPLAINT FOR PATENT INFRINGEMENT

Gibson, Dunn & Crutcher LLP

processing circuitry, disposed in the housing and electrically coupled to the plurality of sensors, to:

> calculate the activity points of the user using the sensor data, wherein the activity points correlate to an amount of one or more physical activities of the user; and

a display, coupled to the processing circuitry, to output the data which is representative of the activity points to the user.

10. A portable activity monitoring device to calculate activity points corresponding to a physical activity of a user, the portable activity monitoring device comprising:

a housing having a physical size and shape that is adapted to couple to the body of the user;

at least one sensor, disposed in the housing, to generate sensor data which is representative of ambulatory activity of the user, wherein the at least one sensor includes a tri-axial accelerometer;

processing circuitry, disposed in the housing and electrically coupled to the at least one sensor, to:

> calculate the activity points corresponding to the physical activity of the user using the sensor data, wherein the activity points correlate to an amount and intensity of the physical activity of the user; and

a display, coupled to the processing circuitry, to output the data which is representative of the activity points to the user.

25. A portable activity monitoring device to calculate activity points corresponding to a physical activity of a user, the portable activity monitoring device comprising:

a housing having a physical size and shape that is adapted to couple to the body of the user;

a plurality of sensors, disposed in the housing, to generate sensor data which is representative of activity of the user, wherein the plurality of sensors includes at least three accelerometers;

processing circuitry, disposed in the housing and electrically coupled to the plurality of sensor, to:

> calculate the activity points corresponding to the physical activity of the user using the sensor data, wherein the activity points correlate to an amount and intensity of the physical activity of the user; and

a display, coupled to the processing circuitry, to output the data which is representative of the activity points to the user.

45.    Philips's Snoring Relief Band is a portable activity monitoring, featuring a housing designed in size and shape to be adapted to couple to the user's body.





46.    The Philips Snoring Relief Band contains a tri-axial accelerometer (i.e., a plurality of at least three accelerometer sensors) in its housing, which is capable of and does generate data representative of the activity of the user (including ambulatory activity).  Processing circuitry is also present in the housing and electronically coupled to the sensors.







Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR PATENT INFRINGEMENT

47.     The Philips Snoring Relief Band, through its processing circuitry, is capable of and does calculate activity points corresponding to the physical activity of the user based on the sensor data, with such data correlating to the amount and intensity of specific physical activity of the user.  For example, the Philips Band tracks the orientation of the user while reclining, recording time spent in specified sleeping positions, number of times positions were changed in response to a specific stimulus, and "response rate" of same to stimulus events.  A display is coupled to the device and above processing circuitry, and outputs data representative of the above activity points to the user.  For example, the display will display the user's activity "response rate."





48.     By making, using, offering for sale, selling, and/or importing the Philips Snoring Relief Band in the United States without license or permission from Fitbit, Philips has infringed, and unless enjoined, will continue to infringe the '377 patent in violation of 35 U.S.C. § 271(a).

49.     In violation of 35 U.S.C. § 271(b), Philips has also actively induced, and will continue to actively induce, users of the Philips Snoring Relief Band to infringe the '377 patent.  Philips offered and continues to offer its infringing product for sale, and instructed and continues to instruct users to

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR PATENT INFRINGEMENT

operate them in an infringing manner through, without limitation, advertisements, product documentation or instructions, and customer support.  Philips had actual knowledge of the '377 patent since at least the filing of this complaint, and, on information and belief, through at least a program of willful blindness, Philips also has constructive knowledge of the patent from long before.  Philips knows or seeks to remain willfully blind that its actious would induce and continue to induce users of its infringing products to infringe the '377 patent.  On information and belief, Philips specifically intended that infringement.  As a result of Philips's inducement, users of its infringing products have infringed and continue to infringe the '377 patent.

50.     In violation of 35 U.S.C. § 271(c), Philips has also contributed to and continues to contribute to the infringement of the '377 patent by the users of its products.  Philips has imported, sold, offered for sale, and continued to sell, offer for sale, and import products like its Snoring Relief Band, which materially constitute the '377 invention.  Philips knew that these products were especially made for or adapted to use in an infringing way, and hence made especially for infringing the '377 patent, given that they are not a staple article or commodity of commerce and have no substantial non-infringing use.

51.     Philips's infringement of the '377 patent is willful.  On information and belief, Philips has either had knowledge of the '377 patent or at least maintained a program of willful blindness, and thus had constructive knowledge of the '377 patent.  Yet, Philips disregarded the patent and continued to disregard an objectively high likelihood that its actions infringe.  This risk is or was known to Philips, or so is obvious that Philips should know of it or have known of it.

52.     As a result of Philips's infringement of the '377 patent, Fitbit is damaged and irreparably harmed by Philips's infringement and will suffer additional irreparable damage and impairment of the value of its patent rights unless Philips is enjoined from continuing to infringe the '377 patent.  Fitbit is also is entitled to monetary damages in an amount adequate to compensate for Philips's infringement, but in no event less than a reasonable royalty for the use made of the invention by Philips, together with interest and costs as fixed by the Court.

53.     Philips's infringing activities have injured and will continue to injure Fitbit, unless and until this Court enters an injunction prohibiting further infringement of the '377 patent, and,

specifically, enjoining further manufacture, use, sale, importation, and/or offers for sale that come within the scope of Fitbit's patent rights.

## JURY DEMAND

54.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Fitbit respectfully requests a trial by jury on all issues so triable.

## REQUESTED RELIEF

55.     Fitbit respectfully seeks the following relief:

a)     The entry of judgment declaring that Philips has infringed each of the Patents-in-Suit;

b)     An award of all available damages, including, but not limited to, Fitbit's lost profits from Defendants' infringement of the Patents-in-Suit, but in any event not less than a reasonable royalty, together with pre-judgment and post-judgment interest;

c)     An injunction restraining Philips and their affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from further infringement, further inducements of infringement, and further contributions to infringement of the Patents-in-Suit;

d)     The entry of an order declaring that this is an exceptional case and awarding Fitbit its costs, expenses, and reasonable attorney fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; AND

e)     An order awarding Fitbit any such further relief as the Court may deem just and proper under the circumstances.

1

2

Dated:  April 8, 2020

3                                                     */s/ Stuart Rosenberg*

4                                                     **GIBSON, DUNN & CRUTCHER LLP**

5                                                     JOSH A. KREVITT (SBN 208552)
                                                      jkrevitt@gibsondunn.com
6                                                     STUART ROSENBERG (SBN 239926)
                                                      SRosenberg@gibsondunn.com
7                                                     1881 Page Mill Road
                                                      Palo Alto, CA 94304-1211
8                                                     Tel: (650) 849-5300
                                                      Fax: (650) 849-5333

9                                                     WAYNE BARSKY (SBN 116731)
                                                      wbarsky@gibsondunn.com
10                                                    2029 Century Park East, Suite 4000
                                                      Los Angeles, CA 90067-3026
11                                                    Tel: (310) 557-8183
                                                      Fax: (310) 552-7010
12

13                                                    Y. ERNEST HSIN (SBN 201668)
                                                      EHsin@gibsondunn.com
14                                                    555 Mission Street
                                                      San Francisco, CA 94105-0921
15                                                    Tel: (415) 393-8224
                                                      Fax: (415) 374-8436
16
                                                      *Attorneys for Plaintiff Fitbit, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2
   Plaintiff Fitbit, Inc. hereby demands a jury trial on all issues so triable.

3

4   Dated:  April 8, 2020                          */s/ Stuart Rosenberg*

5                                                  **GIBSON, DUNN & CRUTCHER LLP**

6                                                  JOSH A. KREVITT (SBN 208552)
                                                   jkrevitt@gibsondunn.com
7                                                  STUART ROSENBERG (SBN 239926)
                                                   SRosenberg@gibsondunn.com
8                                                  GIBSON, DUNN & CRUTCHER LLP
                                                   1881 Page Mill Road
9                                                  Palo Alto, CA 94304-1211
                                                   Tel: (650) 849-5300
10                                                 Fax: (650) 849-5333

11                                                 WAYNE BARSKY (SBN 116731)
                                                   wbarsky@gibsondunn.com
12                                                 2029 Century Park East, Suite 4000
                                                   Los Angeles, CA 90067-3026
13                                                 Tel: (310) 557-8183
                                                   Fax: (310) 552-7010

14
                                                   Y. ERNEST HSIN (SBN 201668)
15                                                 EHsin@gibsondunn.com
                                                   555 Mission Street
16                                                 San Francisco, CA 94105-0921
                                                   Tel: (415) 393-8224
17                                                 Fax: (415) 374-8436

18                                                 *Attorneys for Plaintiff Fitbit, Inc.*

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR PATENT INFRINGEMENT